## YOWELL v. OCCIDENTAL LIFE INS. CO.

No. 6180.   Decided February 26, 1941.   (110 P. 2d 566.)

*Shirley P. Jones* and *Knox Patterson,* both of Salt Lake City, for appellant.

*Van Cott, Riter & Farnsworth,* of Salt Lake City, for respondent.

BAKER, District Judge.

The plaintiff in this action was the beneficiary under a policy of insurance written by the defendant, an insurance company, on the 25th day of February, 1921, by the terms of which the defendant insured one Zella Andrew, sister of the plaintiff, "against loss resulting directly, exclusively and independently of all other causes from bodily

injury sustained during the life of this policy solely through external, violent and accidental means (suicide, sane or insane, or any attempt thereat, sane or insane, excepted)," and undertook to pay to said beneficiary the sum of $1,000, if said insured should lose her life necessarily and solely from such injury as described in the above-quoted part of said policy.

Zella Andrew died on the 26th day of April, 1936, whereupon the plaintiff filed proof of her death with the defendant and made demand upon it for the payment of the principal of said policy. The defendant refused to pay the claim, and the plaintiff commenced this action.

The suit was tried in the court below without a jury. On the trial of the case it was stipulated that said policy of insurance was in full force and effect at the time of the death of said insured and that proof of death and presentation of claim was properly and timely made. The plaintiff alleged in her complaint that the death of Zella Andrew resulted directly, exclusively and independently of all other causes from bodily injury sustained by her in an accident during the life of said policy, solely through external, violent and accidental means, exclusive of suicide. The defendant, by its answer, admitted that Zella Andrew died on the date aforesaid, but denied that her death resulted from bodily injury and denied all other allegations of the complaint relating to the cause and manner of her death.

Thus, but one issue was tendered to the trial court, viz., did the death of Zella Andrew result directly, exclusively, and independently of all other causes from bodily injury sustained by her solely through external, violent and accidental means. After hearing the evidence the trial court found, as a matter of fact,

"That said Zella Andrew did not die as result of the accidental injuries mentioned as aforesaid nor as a result of the injuries sustained by her in said accident and the death of said Zella Andrew did not result directly, exclusively and independently of all other causes from bodily injuries sustained by her during the life of said policy through

external, violent and accidental means. The death of said Zella Andrew was caused directly by disease, to-wit, lobar pneumonia."

The plaintiff here assigns that finding as error, and asserts that there was no substantial evidence before the trial court to support it. That assignment presents the only question to be determined by us on this appeal, and is here determinative of the cause.

At the outset we may remark that it is well settled in this state that we are bound by the findings of fact of the trial court, if there is any substaintial evidence to maintain them (*Brittain* v. *Gorman*, 42 Utah 586, 133 P. 370), and that where a finding is based upon sufficient evidence we will not reverse it, even if we are inclined to arrive at a different conclusion than the trial judge. *Fee* v. *National Bank*, 37 Utah 28, 106 P. 517.

To determine whether or not the finding hereinbefore quoted is supported by substantial evidence which justified the trial court in making it, it is necessary to summarize the evidence. It appears therefrom that the deceased, Zella Andrew, on the 14th of February, 1936, while walking from her residence in Salt Lake City to a grocery store, accompanied by the plaintiff herein, was struck by an automobile. The automobile struck her on the right arm and side, knocked her down, and pushed her for about fifteen feet. She was apparently rendered unconscious for a moment, but as soon as she was able to speak she said that she didn't think that she was badly hurt, and declined an offer by the driver of the automobile to take her to an emergency hospital. Thereupon, with the help of her sister, she walked home—a distance of about three blocks. Upon arriving home the sister gave her a hot bath, rubbed her with alcohol and put her to bed. The next day her condition appeared to be worse, and the morning of the following day, February 16th, her sister called a physician, Dr. David Andrew.

Dr. Andrew, after establishing his qualifications as a physician and surgeon, in the course of which it appeared that he had specialized in gynecology, testified that he

called to treat Zella Andrew on the 16th of February, 1936. He found her in bed suffering from partial shock and breathing with difficulty. His examination then made disclosed that she was black and blue all over the right arm and the right side of the chest, in the region of the pelvis and the legs, and that she had two fractured ribs. She was coughing and appeared to be in great pain, particularly in her head and chest. Dr. Andrew also testified that he had been the physician of the deceased for about twenty-five years; that prior to the accident the general condition of her health had been very good, and that he had never known her to have any serious illness; and that he continued to treat her from the occasion when he was called after the accident until the time of her death.

The patient, according to Dr. Andrew, was unable to move for a period of about ten days, and was confined to her bed for two or three weeks. Thereafter, she visited Dr. Andrew at his office, going there generally in a cab, but at least once by street car. Throughout the period from the first examination until her death she had a cough and complained of pain in her chest. She also complained of pain in her head, and Dr. Andrew called in Dr. Harrow, a nerve specialist, for observation and treatment of that condition. On March 13th she was taken to the Latter-Day Saints Hospital for that purpose. Upon arrival there she was examined by Dr. Harrow, with the assistance of Dr. Andrew. Dr. Harrow made a record of his findings, which was introduced in evidence as an excerpt of the hospital's records. According to that record the patient gave a history of pain in the right side of the face extending back about three years, but ending in the summer of 1935 after some teeth were extracted. The notation of her history also showed that she had influenza in 1919, and had had measles and whooping cough. Among other things the record of the examination showed "Chest—Right lower chest taped. Expansion equal and resonant throughout, no rales." Dr. Harrow administered an alcoholic injection of the trig-

eminal nerve, after which the patient was relieved of pain, and, on March 22nd, she was discharged from the hospital "greatly improved." The hospital temperature chart was also received in evidence. It showed the patient's temperature, pulse and respiration rate for each day she was in the hospital, i. e., for the days from March 13th to March 22nd, inclusive. The chart shows little variation from normal throughout the ten-day period that it covers. On the day of her admission the temperature was 100.4 degrees, and that was its maximum elevation except on the fifth day when it reached 100.8 degrees. On the day of her discharge the temperature was normal. Her pulse rate was between 70 and 80 on the day of her admission, advanced to a maximum of 103 on March 14th, the day of the trigeminal injection, varied below that figure during the remainder of the period, and on the day of her discharge was about 80. Her respiration throughout the period was practically normal.

Dr. Andrew was again called to see the deceased about the 12th of April, and found her very ill. She had a low temperature, her pulse irregular and not extremely fast, about 110, and her respiration rather rapid, about 30. He dignosed her condition as pneumonia, and gave her the usual treatment for lobar pneumonia; however, he regarded the pneumonia as being of an atypical type. She gradually grew worse, and on April 24th was removed to the hospital, where she died the following day. The temperature chart of the hospital shows that on April 24th her temperature was about normal, but that her pulse and respiration were above normal, the former reaching a point between 130 and 140 and the latter a point between 40 and 50.

After her death an autopsy was made upon the body of the deceased. It was performed by Dr. Winget, and Dr. Andrew was present and observed it all. The report of the autopsy was received in evidence. The report gives the clinical diagnosis as "Pneumonia — etiology unknown." It then describes the body as a "well developed and well

nourished white female about 50 years of age." (The actual age of the deceased as establish by her sister was 57 years.) The report describes in some detail the findings in the thoracic and abdominal cavities, including the heart, the stomach and the kidneys. The thoracic cavity is described, in part, in the report as follows:

"On opening the thoracic cavity, both lungs are found to fill only partially the chest cavity. On removing the right lung from the thoracic cavity there is evidence of an old fracture of the seventh and eighth ribs just behind the posterior auxillary line. There is some projection into the chest cavity at the site of the fractures but the fractured area is covered with fibrous tissue. The lung in this area contains some fibrosis and contraction. The lung is firm and on palpation feels as solid as liver. The small portion along the anterior border contains air. Cut sections show all lobes of the lung to be involved in a pneumonic process. The posterior one-half of the entire left lung is also involved in a similar process. There is a slight increase in pleural fluid on each side, but it is not cloudy."

What is termed in the report "Pathological Diagnosis" is as follows:

"Bilateral lobar pneumonia.
"Acute dilatation of the heart.
"Passive congestion of the liver and spleen.
"Chronic cholecystitis.
"Chronic appendicitis.
"Old fracture of seventh and eighth ribs, right side."

It may here be noted that Dr. Andrew did not agree with that part of the report wherein it described the body as "well nourished." His testimony was to the contrary on that point. It may be also noted that the "old fracture" of the ribs, mentioned in the last quotation from the report, referred to the fractures received in the accident of February 14th, 1936.

Dr. Andrew signed the death certificate, wherein the principal cause of death was given as "traumatic pneumonia," and fracture of ribs received in an automobile accident as a contributory cause. He testified at the trial

that death was due to traumatic pneumonia, and that such pneumonia was directly caused by the accident.

The defendant produced only two witnesses in its behalf. Both of them were practicing physicians of long experience in this state, and the qualifications of both were admitted by the plaintiff. Neither of them had known Zella Andrew, and they both testified solely from facts given them in hypothetical questions, and from the hospital temperature charts, the report of the autopsy, and other documents that were received in evidence. The facts assumed in the hypothetical questions, aside from those appearing from said documents, included the age of the deceased, the accident of February 14th, and the fractured ribs received therefrom, the walk home after the accident, the calling of Dr. Andrew two days later, and some others which appeared from the evidence and are recited herein. The opinion of both experts was that the deceased did not die of traumatic pneumonia, and that there was no connection between the death and the accident of February 14th.

They gave as reasons, among others, for their respective opinions that traumatic pneumonia usually develops within from three to five days after the injury, and that the deceased had evidently recovered from any injury to her lungs before the pneumonia set in. Both stated also that there was no appearance of any lesion or puncture of the lung, and Dr. Hummer testified that there was nothing to indicate an injury to the lung except the statement in the autopsy report that there was some protrusion into the chest cavity at the site of the fractures.

The plaintiff produced one new witness in rebuttal, Dr. R. J. Friel. Dr. Friel testified that he had practiced medicine in Salt Lake City for seven years, principally in the field of general surgery, but that he had had some experience with pneumonia. He testified that in his opinion it is possible for traumatic pneumonia to develop two months after the injury. In support of his opinion he recalled one case in his own experience where a miner who had suffered

two or three broken ribs as a result of an accident developed traumatic pneumonia some nine or ten weeks after the injury.

As has hereinbefore indicated the controlling question presented by this appeal is whether or not there was any substantial evidence before the trial court to support its finding that death did not result from accidental means in accordance with the provisions of the policy. Plaintiff here contends that no question of fact was presented to the trial court, that the evidence presented by the defendant must be disregarded, and that upon the basis of plaintiff's evidence findings and judgment should be in favor of plaintiff. In support of those contentions plaintiff argues that the conclusions of defendant's witnesses were arrived at by the assumption of facts not in evidence and that such conclusions were reached solely upon the basis of hypothetic facts rather than from actual observation of the deceased. In connection with the latter it is argued that the plaintiff's witness, Dr. Andrew, had been personal physician of the deceased prior to the time of the accident, from that time until her death, and that he had been present at the autopsy, whereas the two physicians who testified for the defendant did not have the benefit of actual examination of the deceased either before or after her death.

It is of course true that where opinion evidence flies in the face of uncontroverted physical facts also in evidence that the opinion must give way to the fact, and that the opinions of witnesses are not properly admissible where the issue may be resolved by persons of common knowledge and understanding who have possession of the facts. *Ruping* v. *Oregon Short Line R. Co.*, 51 Utah 480, 171 P. 145. When the testimony of experts is properly admissible, however, their conclusions may be sufficient to support a finding or verdict, even if based on properly assumed facts and opposed by expert testimony based on personal examination. *Dawson* v. *Banker's Life Co.*, 216 Iowa, 586, 247 N. W. 279.

With regard to the contention that the conclusions of defendant's witnesses were arrived at upon the basis of assumed facts which were not in evidence, we do not agree with the plaintiff. The defendant's witnesses had before them as foundations for their opinion all of the evidence that was essential to a reasonable opinion, and that they gave sound and logical reasons for their conclusions.

True, the plaintiff's expert witness had the advantage of personal observation of the deceased in her lifetime and actual observation of the autopsy, but his conclusions as to the cause of the pneumonia which resulted in her death was after all an opinion the probative force of which was to be determined, in conjunction with all the other evidence, by the trial court. The fact of Dr. Andrew's greater opportunity for direct observation might affect the credence to be given his testimony, but it would not render opposing testimony based upon properly assumed facts incompetent. Moreover, the court had before it, not only the opinions of the witnesses, but also the facts upon which the opinions of experts both for plaintiff and defendant were based. Expert witnesses gave opinions based upon those facts as to the cause of death, and the probative force of those opinions was a matter for the trial court's determination. Certainly, we may not here affirm, that it was concluded by the testimony of Dr. Andrew, and was bound to disregard the testimony of the defendant's witnesses. It is to be remembered, too, that the trial court in reaching its conclusions as to the weight of the evidence had the benefit of the actual presence of the witnesses, and of an extended cross-examination of each of them.

Accordingly, we conclude that the questioned finding of the trial court as to the cause of death of the deceased insured is sustained by the evidence, and we may not interfere with such finding.

Other cases which support the conclusions herein reached are the following: *Lee* v. *New York Life Ins. Co.*, 95 Utah

445, 82 P. 2d 178; *Traveler's Insurance Co.* v. *Diner,* 6 Cir., 75 F. 2d 3; *Orey* v. *Mutual Life Ins. Co.* 215 Ind. 305, 19 N. E. 2d 547; *Killam* v. *Travelers Protective Ass'n,* Mo. App., 127 S. W. 2d 772; *Police & Firemen's Ins. Ass'n* v. *Blunk,* Ind. App., 20 N. E. 2d 660; *City of Cherokee* v. *Aetna Life Ins. Co.,* 215 Iowa 1000, 247 N. W. 495.

The judgment is affirmed.

MOFFAT, C. J. and LARSON, WOLFE, and PRATT, JJ., concur.

McDONOUGH, J., being disqualified, did not participate herein.